STATE OF CONNECTICUT *v.* AHMAAD LANE
(AC 27257)

Bishop, Harper and Dupont, Js.

Argued March 13—officially released June 5, 2007

*Robert E. Byron,* special public defender, for the appellant (defendant).

*Christopher T. Godialis,* senior assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Terence D. Mariani,* senior assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Ahmaad Lane, appeals from the judgment of conviction, rendered after a jury verdict, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The defendant claims that the trial court

improperly (1) allowed the jury to be selected in a racially discriminatory manner in violation of his rights to equal protection of the law and a fair trial and (2) denied his motion to suppress evidence of an out-of-court photographic identification. We affirm the judgment of the trial court.

I

The defendant first claims that the manner in which the jury was chosen violated his rights to equal protection and a fair trial. Specifically, he argues that the state impermissibly exercised two of its peremptory challenges in a racially discriminatory manner, that the court impermissibly prevented him from bringing a claim pursuant to *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and that the court excused a juror on the basis of race after the jury had been selected.[1]

In this case, voir dire lasted four days. The jury panel selected was comprised of six jurors and two alternates. The race of the first juror chosen, T,[2] is identified in the record as black. Both the state and the defendant found her acceptable, and the record reveals little comment at the time she was chosen. The state's first peremptory challenge was used against K. K was raised in the Virgin Islands and had been living in the United States since the late 1980s. His race is not explicitly identified in the record, although he is identified as being a racial minority. The record reflects that K was the only potential juror interviewed for this trial who previously had been arrested by the Waterbury police department, members of which the state planned to

---

[1] The record does not reflect the race of most of the members of the jury, or of the venire, but the state does not contest the defendant's assertion that the jury, which ultimately decided the defendant's guilt, was made up entirely of white jurors.

[2] We refer to the jurors by initial to protect their legitimate privacy interests. See, e.g., *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004).

have testify. Although K indicated that, overall, his inter-action with Connecticut's criminal justice system "wasn't a bad experience," he did state that he did not believe he was treated fairly by the police at the time. He further stated that the police had "roughed me up a little." After K left the witness stand, the state indicated that it wanted to exercise a peremptory challenge. See Practice Book § 16-5. The court then questioned: "All right, anything else?" The following colloquy ensued between the court and the parties:[3]

"The Court: Just to—I mean, we all know that when a minority juror is excused, that the court should be mindful of the fairness of that. And there is some pressure on a defense attorney to make a *Batson* challenge. You don't have to. If you did in this case, just for the record, and this is what we're all thinking about without saying it—

"[Defense Counsel]: Right.

"The Court: You know, you're probably thinking, should I make a *Batson* challenge. If you had, I think, and I don't want to speak for [the prosecutor], but I think there are solid reasons why—solid race neutral reasons why [the prosecutor] might exercise a challenge here, and most of them concerning this nice gentleman's unfortunate experience with the Waterbury police, who are going to be witnesses in this case. So, that would—am I misstating your position?

"[The Prosecutor]: No, Judge. I mean, that's my primary concern, obviously.

"The Court: And it's never wrong to talk about these issues. And [the prosecutor], without hesitation, when the first minority juror was questioned, he asked the

---

[3] The defendant characterizes the court's next statement as following "immediately" after the court asked whether there was anything else. The record does not reflect the time duration between the two statements.

same questions that he asked this gentleman, and accepted [T].

"[Defense Counsel]: Yes.

"The Court: He accepted her without hesitation, and he was the first questioner. So, he didn't have to wait to find out if you would accept her. So, I don't see any problem here, and I'm sure that everybody was wondering how this would be handled, and that's the way it would have been handled. There's a clearer record of that so everybody feels better now.

"[Defense Counsel]: Thank you."

On the third day of jury selection the state exercised its third peremptory challenge against D.[4] D's race is not reflected in the record. D was raised in Jamaica, one of twelve children. D indicated that she had previously been the victim of a robbery while living in New York. She said that she had no problems with the performance of the police at the time. She indicated that she had had no prior dealings with the Waterbury police department. She also stated that she had been in a court previously when she filed for bankruptcy. Defense counsel did not object to the state's exercise of its peremptory challenge against D.[5]

Eventually, the parties selected six jurors and two alternates. Immediately preceding commencement of the trial, it was brought to the court's attention that T had not yet arrived. The record reveals the following:

---

[4] The state had exercised a second challenge on the second day of jury selection. That challenge is not at issue in this appeal.

[5] Specifically, the record reflects the following exchange:

"[Defense Counsel]: May I have a moment, Judge?

"The Court: You may.

"[Defense Counsel]: Accepted.

"[The Prosecutor]: I would exercise a challenge, Judge.

"The Court: All right. You've been excused from service on this case. Thank you for coming down and answering the questions. You are all set. You are excused for the day."

"The Court: So, now, the issue of the missing juror. . . . I can't wait for this juror. It's a minority juror, but that doesn't make any difference. People can't follow simple orders of the court and show up on time. And I can't delay the case waiting for this juror to come to court. So, she's excused. You want to be heard?"

Defense counsel then requested that the court wait a few minutes to see whether T would arrive. She represented that T was on her way. The court then checked with the clerk:

"The Court: I don't know if she ever—did she ever indicate she was on her way?

"The Clerk: She said she could be on her way. She said she was over an hour away."

The court further asked the clerk whether T had been informed within a day or two of the day of trial. The clerk replied that she had. The court noted the defendant's objection and chose one of the alternates to replace T.

On the basis of this record and the precepts of *Batson v. Kentucky*, supra, 476 U.S. 79, we must determine whether the jury was selected in a racially discriminatory manner. "In *Batson* . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . [T]he Equal Protection Clause [of the fourteenth amendment] forbids the prosecutor to challenge potential jurors solely on account of their race." (Internal quotation marks omitted.) *State v. Monroe*, 98 Conn. App. 588, 590–91, 910 A.2d 229 (2006), cert. denied, 281 Conn. 909, 916 A.2d 53 (2007). "Discrimination in the selection of a jury . . . harms

the litigants, the excluded jurors, and the community. . . . Litigants are harmed because the discriminatory selection process may affect the fairness of the proceedings. . . . The very idea of a jury is a body . . . composed of the peers or equals of the person whose rights it is selected or summoned to determine. . . . Individual jurors are harmed because all persons, when granted the opportunity to participate in the judicial process, have the right not to be excluded based on stereotypical presumptions about their abilities and attitudes. . . . A person's competence to serve as a juror is determined by an assessment of individual qualifications, not by stereotypical assumptions about those abilities. . . . Finally, [t]he community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders." (Citations omitted; internal quotation marks omitted.) *Martins* v. *Connecticut Light & Power Co.*, 35 Conn. App. 212, 224, 645 A.2d 557, cert. denied, 231 Conn. 915, 648 A.2d 154 (1994). "Furthermore, because the only direct contact most Connecticut citizens have with our justice system is as venirepersons, the process by which jurors are selected plays a major role in the public perception of this branch of government." *State* v. *Hodge*, 248 Conn. 207, 271, 726 A.2d 531 (*Berdon, J.*, dissenting), cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established

purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination." (Internal quotation marks omitted.) *State* v. *Monroe*, supra, 98 Conn. App. 591. "The trial court's determination on the question of discriminatory intent represents a finding of fact . . . . Accordingly, a . . . court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous." (Internal quotation marks omitted.) Id., 592.

Generally, "[t]he trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not be disturbed absent a showing of an abuse of discretion. . . . A trial court may dismiss a juror who is unable to perform his or her duties upon a finding of cause." (Citation omitted; internal quotation marks omitted.) *State* v. *Diaz*, 94 Conn. App. 582, 588, 893 A.2d 495, cert. denied, 280 Conn. 901, 907 A.2d 91 (2006). The requirements of due process, however, prohibit a court from excusing jurors for racially discriminatory reasons. *Ex Parte Virginia*, 100 U.S. 339, 347–49, 25 L. Ed. 676, (1880); see also *Powers* v. *Ohio*, 499 U.S. 400, 402, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).

The defendant first argues that the state's challenge of K was impermissible. The defendant's trial counsel did not raise a *Batson* claim when K was excused. The record reveals that the court itself, in the absence of objection by the defendant, or, perhaps, in the absence of time for an objection, raised the *Batson* issue after the state exercised a peremptory challenge. On the basis of the seriousness of the claim and the court's clear recognition of the possibility of a *Batson* claim, the issue is sufficiently preserved for our review.

When the court raised the *Batson* issue, it stated: "I think there are . . . solid race neutral reasons why [the prosecutor] might exercise a challenge here, and most of them concerning [K's] unfortunate experience with the Waterbury police, who are going to be witnesses in this case." The prosecutor acknowledged that this was the state's primary concern with K but did not otherwise comment on the reasoning the court imputed to the state. Defense counsel did not then raise any argument that this concern was merely pretextual or attempt to argue that the state struck K from the panel for some improper reason. Not asked to consider any countervailing argument by the defendant, the court determined that the state did exercise its peremptory challenge in a permissible manner. In light of the fact that the defendant asserted no argument before the court that the state's reasons for excusing the juror were pretextual after the court raised the issue, and that the defendant has failed, on appeal, to show that any other prospective juror had had a similar interaction with the Waterbury police department but was accepted nevertheless as a juror, we conclude that it was not clearly erroneous for the court to determine that the prosecutor did not act with an impermissible motive.

The defendant next argues that the state's peremptory challenge against D was impermissible. The defendant did not raise a *Batson* claim at the time the state excused D. Therefore, the state was not called on to provide a justification for its use of the peremptory challenge. The record does not reflect D's race.[6] We conclude that we cannot review any *Batson* claim as

---

[6] The record does reflect that D was raised in the Caribbean. The defendant, however, raised no argument at trial and makes no argument here that the state impermissibly used its peremptory challenge against D on the basis of her place of birth. See *State* v. *Rigual*, 256 Conn. 1, 10, 771 A.2d 939 (2001) ("[d]iscrimination on the basis of ancestry or national origin clearly is in violation of the equal protection clause of the federal constitution").

to D that the defendant may have had regarding the state's use of its peremptory challenge against D because of a lack of a sufficient record. See *State* v. *Owens*, 63 Conn. App. 245, 263, 775 A.2d 325, cert. denied, 256 Conn. 933, 776 A.2d 1151 (2001).

Finally, the defendant argues that he was denied a fair trial because the court allegedly prevented him from raising a *Batson* objection when K and D were excused and dismissed T because she failed to arrive at court. Regarding the peremptory challenges, the defendant relies principally on the court's statements of the prosecutor's probable reasons for exercising a peremptory challenge as to K before the prosecutor provided them, and the court's statement, with reference to a potential *Batson* issue, that "I don't see any problem here . . . ." It is true that the court's review of the potential *Batson* issue did not strictly conform to the procedure outlined by our Supreme Court and that the trial court may have determined the outcome of the issue before the defendant had an opportunity to raise it. Though the court did state, "I don't see any problem here," it also clearly stated that "it's never wrong to talk about these [*Batson*] issues," and defense counsel provided the court with no reason to conclude that there was a problem with the state's action. As to the excusal of K, therefore, the defendant has not proven that the court attempted to dissuade defense counsel from raising *Batson* objections.[7]

Regarding the dismissal of T, the record shows that T was not at court when she was required to be there.

---

[7] Because we conclude that the record does not support the defendant's contention that the court discouraged defense counsel from raising a *Batson* objection, we need not determine at what point a court's reluctance to hear a *Batson* objection would have violated the defendant's right to a fair trial. See *Smulls* v. *Roper*, 467 F.3d 1108, 1115 (8th Cir. 2006) (ordering further proceedings by habeas court because there was evidence trial court antagonistic toward *Batson* objection).

The court conferred with the clerk and learned that T was more than one hour away, was not on her way to the court at the time and had been previously notified of the court date. Although the court did acknowledge the race of T at the time it dismissed her, the defendant has not provided any evidence that this was a factor in the court's decision to proceed to trial with an alternate juror. The court, to the contrary, clearly stated that race was not a factor and subsequently invited the defendant to object to the decision, which the defendant did. The defendant does not appear to have raised any argument that the court's dismissal of T was racially discriminatory. On appeal, the defendant makes no argument that any other juror was late to court but treated differently. We conclude that the defendant has not shown that the court violated his right to equal protection of the law or a fair trial.

II

The defendant next claims that the court improperly denied his motion to exclude evidence of a prior out-of-court identification of him made from a photographic array. The defendant argues that the court's determination constituted both a violation of his due process rights and an abuse of the court's discretion pursuant to our rules of evidence.[8]

The following facts are relevant to the defendant's argument. The defendant filed a motion to suppress

---

[8] Additionally, the defendant claims that the court used an improper standard when determining that the evidence should be admitted. The defendant highlights the court's statement that "the whole idea of suppression, keeping evidence from coming in, is to make a point with the police if they do something wrong," as proof that it was using an improper legal standard. The defendant did not, however, object to the court's statement at trial. Further, the court did conduct the analysis that the defendant, on appeal, asserts it should have conducted; instead, it considered whether the testimony was reliable enough to be admitted, stating that "from the testimony I've heard, I don't think that even the fact that the victim was taking pain medicine interfered with the procedure." We conclude that the defendant has waived this argument. *State* v. *Patterson*, 230 Conn. 385, 392–93, 645 A.2d 535 (1994).

evidence of the prior photographic identification. The court heard argument on the motion on September 13, 2005. At the hearing, the defendant conceded that the identification procedure was not suggestive. The victim was handed a collection of photographs in a book, which resembled a photograph album. Defense counsel focused her argument on the ability of the victim to make a reliable identification due to his injury and his treatment in the intensive care unit. The defendant presented no evidence during the hearing, however, that the victim was not sufficiently mentally competent to make a reliable identification.

The state presented three witnesses in connection with the defendant's motion. The first witness was the victim. The state asked the victim about his mental condition at the time of the identification. The victim stated that he was able to communicate with the police. The prosecution further asked whether the victim had any difficulty understanding the police or explaining his answers to them. The victim indicated that he had no communication difficulties. During cross-examination, defense counsel asked whether the victim was on medication when he made the identification. The victim indicated that he was given morphine intravenously to ease the pain he suffered after a bullet was removed from his back. He also testified, however, that he "felt like [he] was functioning normally" and again asserted that he had no trouble understanding the police.

The state then called the two investigating officers who witnessed the identification. Both testified that although they could not recall whether the victim was being administered morphine at the time, the victim was lucid, well aware of his surroundings and appeared to be thinking normally. Finding the identification sufficiently reliable to be admitted, the court denied the motion to suppress.

Out-of-court identifications of a defendant, whether by photographic arrays, lineups or otherwise, are admissible in some instances. *State* v. *McClendon*, 199 Conn. 5, 9–10, 505 A.2d 685 (1986). The requirements of due process, however, limit the admissibility of such evidence in certain circumstances. *Manson* v. *Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). For example, the state is prohibited from suggesting to a witness during a photographic identification which photograph is of the individual that the state suspects is the perpetrator of the crime. See id., 112. When such a suggestion is made, evidence of the subsequent identification is not admissible unless the state can show that the identification is otherwise reliable. *State* v. *Elliston*, 86 Conn. App. 479, 483–84, 861 A.2d 563 (2004), cert. denied, 273 Conn. 906, 868 A.2d 746 (2005).

The defendant here concedes that the procedures employed during the out-of-court identification were not suggestive. Instead, the defendant argues that the victim's medicated state at the time of the identification rendered his identification so unreliable that its admission constituted a violation of due process. The defendant cites no case law supporting this proposition.[9]

We need not determine whether the demands of due process would, in other circumstances, prohibit identification evidence from being admitted based solely on the victim's lack of competency at the time of the identification. The court, on the basis of the evidence before

[9] The defendant also asks this court, in reviewing his claim that the identification made by the victim was impermissibly unreliable, to consider that the victim was unable to identify the defendant in court during the trial. The defendant does not argue that positive identification in court is a prerequisite to the admissibility of out-of-court identifications. He also has not presented any precedent indicating that the inability of a witness to identify the defendant in court, several years after the incident, after the witness' memory is likely to have faded and the defendant's physical appearance may have altered considerably, is compelling evidence to prove that the witness' identification made only a few short days after the incident was unreliable.

it, properly concluded that the victim's medication did not prevent the victim from providing a reliable identification. The court heard testimony from the victim and two witnesses to the identification that the victim was able to make an identification, even though he was in the hospital's intensive care unit at the time. The defendant did not produce testimony of attending medical staff or any other evidence contradicting this testimony. We conclude that the defendant has not demonstrated that the admission of this prior identification infringed on his constitutional right to a fair trial.

This does not end the inquiry, however, because an out-of-court identification of the defendant is hearsay, and, as a matter of the law of evidence, to be admissible, it must satisfy an exception to the rule against hearsay. *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992). The applicable exception is recognized in Connecticut Code of Evidence § 8-5, which provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial . . . (2) The identification of a person made by a declarant prior to trial where the identification is reliable." The determination of reliability is a question for the trial court and our review is limited to a determination of whether the court's determination constitutes an abuse of discretion or whether an injustice has occurred. *State* v. *Salmon*, 66 Conn. App. 131, 135, 783 A.2d 1193 (2001), cert. denied, 259 Conn. 908, 789 A.2d 997 (2002). This is so because whether evidence of a pretrial identification is admissible depends on a fact bound determination. Id.

As stated previously, the court heard testimony from the victim that he was able to comprehend and communicate with the police at the time of the identification. Both of the officers who witnessed the victim make the identification testified that he appeared able to make a reliable identification at the time. We conclude that

it was not an abuse of the court's discretion to conclude from these facts that the identification was sufficiently reliable to be admitted into evidence.

The judgment is affirmed.

In this opinion the other judges concurred.