STATE OF CONNECTICUT *v.* DAVID C. WRIGHT
(AC 23467)

Foti, West and McLachlan, Js.

Argued September 13—officially released November 16, 2004

*William B. Westcott*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *C. Robert Satti, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, David C. Wright, appeals from the judgment of conviction, rendered after a jury trial, of carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 and illegal possession of a weapon in a motor vehicle in violation of General Statutes § 29-38.[1] On appeal, the defendant claims that the trial court (1) deprived him of his right to challenge jurors peremptorily and (2) unduly limited his closing argument to the jury. We agree with the defendant's first claim, reverse the judgment and remand the case for a new trial.[2]

The charges against the defendant arose from an incident that occurred on the evening of October 15, 2000, in Bridgeport, and resulted in the death of one man and the wounding of a second man, both by gunshot. During jury selection, the defendant attempted to exercise a peremptory challenge following the voir dire

---

[1] The defendant was found not guilty of assault in the first degree and not guilty of murder.

[2] Because we reverse the judgment and remand the matter for a new trial on the basis of our resolution of the defendant's first claim, it is unnecessary for us to address the defendant's second claim.

examination of jurors J and D.[3] The state objected to these attempts and, in each instance, the court sustained the state's objection and seated the juror.

Immediately following the voir dire examination of J, the following colloquy in relevant part occurred between the court, defense counsel, William Schipul, and the prosecutor, C. Robert Satti, Jr.:

"The Court: Thank you. Mr. Satti?

"[The Prosecutor]: No questions.

"The Court: Your choice, Mr. Schipul?

"[Defense Counsel]: Excused.

"The Court: Okay.

"[The Prosecutor]: I'd ask to be heard on the excuse then, please, Your Honor.

"The Court: What's that?

"[The Prosecutor]: Nonneutral reason or a neutral reason.

"The Court: Do you have a reason, Mr. Schipul? I think it goes to both sides, doesn't it, after the recent cases?

"[Defense Counsel]: Yes, Your Honor.

"The Court: What would be your reason?

"[Defense Counsel]: Well, it—it appeared that the— that the juror didn't really want to be here, that there's something about the body language that—that suggested that.

"The Court: We're supposed to talk about a race neutral statement that you find some other reason to exer-

---

[3] References to individual jurors will be made by use of initials so as to protect their legitimate privacy interests. See, e.g., *State* v. *Walker*, 80 Conn. App. 542, 544 n.2, 835 A.2d 1058 (2003), cert. denied, 268 Conn. 902, 845 A.2d 406 (2004).

cise. Now, this—you know, who knows what's going to happen down the road here, but I think you're going to lose your peremptory challenges unless you explain them, everybody is, they're tired of it.

"[Defense Counsel]: Yes, Your Honor.

"The Court: It doesn't make any sense. What's—this man is fair. Will you want to step outside a minute please, [J]?

"[J]: There?

"The Court: I think you should go out there. My clerk will be out to get some information.

[J exited the courtroom.]

"The Court: Yes? You may proceed. What is the rest of your reasoning?

"[Defense Counsel]: Well, he also said at one time that he thinks he can be fair. He wasn't 100 percent positive about that statement. I agree it was a close call in his case.

"The Court: It is? I don't see anything that shows me any unfairness here. His background doesn't indicate that, either education or experience.

"[Defense Counsel]: We're looking for somebody that had a little more knowledge about the Bridgeport area, about the areas involved.

"The Court: That's of no moment.

"[Defense Counsel]: And he apparently doesn't have a lot of experience with the—with the area. It . . . seems as if he was—based upon what he said, the way he was—the way he was addressing—

"The Court: We should have a videotape here so the Appellate Court can look at it. I didn't see any body language. The man never moved from his chair.

"[Defense Counsel]: Well, he seemed to be looking down a lot.

"The Court: Well—

"[Defense Counsel]: Toward the floor, which suggests that a person is not really interested really in—

"The Court: I don't—

"[Defense Counsel]: —in being here.

"The Court: What's your position, Mr. Satti?

"[The Prosecutor]: My position is that I've heard nothing that is a race neutral reason for excusing. I move that he be seated as we did . . . earlier.

"The Court: Do you think that's the only issue?

"[The Prosecutor]: No.

"The Court: What if you had a race neutral issue, but the man said I'd believe every cop I ever saw, coming in to be a witness they would have a strong edge in my mind. Of course, that would justify a use of a challenge, correct?

"[The Prosecutor]: It would be a neutral reason for excusing, correct.

"The Court: But not race oriented?

"[The Prosecutor]: Correct. What I meant was a neutral reason for—it's usually called race neutral.

"The Court: I don't see any here. Now, is this the case we want to seat people? Have you got authority? Have you seen other people seated because they have not exhibited anything that would be harmful in any way as a threshold issue for any party on trial?

"[Defense Counsel]: Your Honor, the—I make a habit of talking to my client—

"The Court: I understand that, but your client doesn't control the selection of a jury.

"[Defense Counsel]: And he doesn't, Your Honor.

"The Court: I'm here to get a fair minded jury, not a hand chosen selected jury for some nebulous reason. These citizens have a right to serve. And if they're neutral and they have no ax to grind, they're more than welcome in this courtroom.

"[Defense Counsel]: Your Honor, race was not an issue as far as this—

"The Court: And I see no other issue. I'll seat him."

Immediately after the voir dire examination of D, the following colloquy occurred:

"[The Prosecutor]: It's my choice. Acceptable.

"[Defense Counsel]: I move to excuse for cause, Your Honor.

"The Court: What would that be?

"[Defense Counsel]: The juror has expressed that his way of coming to a decision very possibly could—he could make a decision before we get to the end of the case.

"The Court: No, he didn't say that. Go ahead. What else?

"[Defense Counsel]: And if that were to happen, then he may have missed some of the evidence from coming from the—

"The Court: That is nowhere within the context of the answers given to your questions.

"[Defense Counsel]: I think that's a fair interpretation.

"The Court: Well, that's yours, it's not mine. Your motion is denied.

"[Defense Counsel]: I would excuse.

"The Court: Okay.

"[The Prosecutor]: Your Honor, at this time I would like to take up a motion outside the presence of this—

"The Court: Okay. Would you step outside?

[D exited the courtroom.]

"The Court: Yes?

"[The Prosecutor]: I'm moving that he's seated, but I think there's an issue regarding [a] neutral reason, but also the last three challenges were to three white males, roughly the same age with what I—I'm not sure if any—I'm concerned about a pattern now. This is four challenges, I believe, that all white males of roughly the same age, and I would ask that he be required to place a neutral reason for this excuse. So, it's not just the issue of neutral reason, but now I'm suggesting there might be an issue of race.

"[Defense Counsel]: We do have a white male on the—at least one, possibly more, that was seated early on, one of the first few jurors. It's got nothing to do with race, Your Honor. It has got everything to do with the way in which he kept insisting on the way in which he came to a decision. And that's—causes a great worry for the defense when the defense goes second, knowing that the burden is on the state [and] the juror was candid enough to indicate that he often—his pattern is to come to a decision as soon as he gets enough information.

"And he did not assure us that would be necessarily at the end of the case. He said he comes to a decision very—as soon as he possibly can because that's the nature of his business. And I think he was fair enough to indicate that because it's obviously a concern to him, and it's a concern to the defense because he—if he

doesn't wait until the end of all of the evidence, until the arguments by the attorneys and until the instructions of the law to decide the case, that he will not have had the benefit of hearing all of that and the benefit of exchanging views with his fellow jurors.

"The Court: Anything else? You discount race altogether, is that it?

"[Defense Counsel]: Yes, Your Honor.

"The Court: Good. What else do you have?

"[Defense Counsel]: What's that, Your Honor?

"The Court: Those are the two issues. Anything else?

"[Defense Counsel]: No, Your Honor, that's it.

"The Court: Okay, anything further, Mr. Satti?

"[The Prosecutor]: No, Your Honor.

"The Court: I view the matter as one of semantics and one to be created by your questioning solely for the purpose of looking for an excuse not to accept a juror, any juror whatsoever. This man is a citizen of the United States. He's here in response to a duly authorized summons to be here as a juror. He's entitled to serve if he's qualified. He gave no answer here that would indicate to me that he's unqualified to be a juror in this case.

"You would like to have it believed that he was going to decide, by his answers, to decide this case during the evidence. He nowhere has said that. He made it clear through my questions alone that you cannot decide the case until you're given the opportunity to do so with fellow jurors. The speed with which a juror reaches a decision after that point is not subject to any inquiry. The deliberative process has to spin out in its own pace. And no question by me or you or the state will intrude on that because there's no way of knowing until the

case is over and in their hands. I order him seated. Your arbitrary use of a peremptory on this basis is unacceptable. Next.

"[Defense Counsel]: Your Honor—Your Honor, the pattern—

"The Court: I've already—there's nothing before me, Mr. Schipul."

The defendant argues that the court's denial of his right to exercise peremptory challenges with regard to J and D deprived him of his rights to due process, the assistance of counsel and the right to a jury trial in violation of the sixth and fourteenth amendments to the United States constitution and article first, §§ 8 and 19, of the constitution of Connecticut.

Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides in relevant part that "[i]n all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. . . ." "Peremptory challenges are deeply rooted in our nation's jurisprudence and serve as one state-created means to the constitutional end of an impartial jury and a fair trial. . . . Although such challenges generally may be based on subjective as well as objective criteria . . . they may not be used to exclude a prospective juror because of his or her race or gender." (Citations omitted; internal quotation marks omitted.) *State* v. *Hodge*, 248 Conn. 207, 217, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

"In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seri-

ousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 283, 750 A.2d 1059 (2000). In *Georgia* v. *McCollum*, 505 U.S. 42, 49–50, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992), the United States Supreme Court extended the prohibition against race based peremptory challenges to criminal defendants.

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a

perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, supra, 253 Conn. 283–85.

Here, the defendant attempted to exercise peremptory challenges to exclude J and D from the jury. The state raised a *Batson* claim in both instances and, in both instances, the defendant advanced a race neutral explanation for the venireperson's removal. The record reflects, however, that the state, as the party asserting the claim, did not sustain its burden of demonstrating by a preponderance of the evidence that the articulated reasons for removal were pretextual and that the defendant was tainting the jury selection process by purposeful discrimination. In fact, the state's failure in each instance to provide the court with any reasons why the defendant's race neutral explanation was pretextual may be treated as an "acquiescence in the validity" of the defendant's explanation. *State* v. *Morales*, 71 Conn. App. 790, 804, 804 A.2d 902, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002).

Here, the court did not make any findings with regard to discriminatory intent. In its brief, the state concedes, and we agree, that the defendant set forth race neutral reasons to justify his attempts to exercise peremptory challenges with regard to those jurors. In each instance, the court disallowed the use of the peremptory chal-

lenge on the ground that it simply disagreed with the defendant's unfavorable assessment of the venireperson's ability to be a fair and impartial juror. The court also repeatedly expressed its views, which were aimed toward restricting or curtailing the parties' use of peremptory challenges.[4] The court's rulings unjustly deprived the defendant of his right to exercise his peremptory challenges.[5]

[4] During the course of jury selection, the court addressed the parties as follows: "What do you think? I think it's time we have to address this voir dire. This is insatiable, and it's not getting anywhere. Most of the—a good 30 percent of the questions asked are totally irrelevant to this. And I know that you don't care. I know lawyers don't care, but I can tell you this is going to be cut back and the voir dire is going to go, so are peremptory challenges. Everything will be cause or you're going to have [to] stand up for your peremptories. It's changing and everyone knows it's coming except people on the floor. This is stupid. We should have a jury here of fair minded people. You had plenty today you could take. There were a lot of strange ones, too." The court later commented: "I'd like the Supreme Court to address the issue of peremptory challenges, and I'd like to have them deal with the race neutral issue."

[5] In one instance, the court did not allow the state to exercise a peremptory challenge on the ground that it believed the venireperson would be a fair and impartial juror. The state sought to exercise a peremptory challenge with regard to juror L, who had been acceptable to the defendant. The court, sua sponte, inquired of the prosecutor with regard to his decision to exercise a peremptory challenge. The following colloquy occurred:

"The Court: What's the reason—give me a reason why you're not seating this woman.

"[The Prosecutor]: The evidence in this case that I expected to present is that this club [where the incident at issue occurred] was run by the defendant and his family by the name of Wright, who were Jamaicans. The night in question, there was a party for ostensibly a drug dealer who was going away to jail. All of the non-Jamaican individuals are searched at the door. The Jamaicans are not searched at the door, which would include this defendant and his brother, who were eventually found to be armed inside the club. The only people with guns was the owner, a Patrick Wright, who is Jamaican.

"And the witnesses are going to testify that because of their treatment, and they were mostly black males that went in, there was one Hispanic who was the victim of the homicide, they were treated differently on the issue of ancestry of Jamaican background. I think that's going to play greatly into this particular case as to explaining why certain people had weapons or not.

"The Court: A weapon is a weapon is a weapon.

"[The Prosecutor]: There's no question about it, but there is an indication the motivation for—

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

"The Court: Well, how does it affect her?

"[The Prosecutor]: Because the motivation for this, we would allege, has a racial animus in it.

"The Court: But she doesn't have any.

"[The Prosecutor]: I understand that. But she's also—she has been a victim of a racial incident, she has a father that's Jamaican. The claim that the witnesses are going to be saying is that as a result of activities by the victim in this case, a fight was started by his brother, that this defendant joined in. That has racial animus in it.

"The Court: I don't see where she's affected by it. I'm going to seat her. She gave me the impression of being a wholly acceptable juror. She's not going to be affected by it, I don't know, but we can't tell based simply on the fact that the Wright brothers ran a gun free lounge, and if you came in without one and you were Jamaican, they give you one. That's unfair. Did they?"