# STATE OF CONNECTICUT *v.* NORMAN J. HAUGHEY
## (AC 30862)

DiPentima, C. J., and Gruendel and McDonald, Js.

Argued April 6—officially released September 21, 2010

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Robin S. Schwartz*, special assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Eugene R. Calistro, Jr.*, and *Gary W. Nicholson*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Norman J. Haughey, appeals[1] from the judgment of conviction, following a

[1] The defendant originally appealed to the Supreme Court pursuant to General Statutes § 51-199 (b) (3). Thereafter, the Supreme Court transferred the appeal to this court pursuant to § 51-199 (c) and Practice Book § 65-1.

jury trial, of two counts of murder in violation of General Statutes § 53a-54a (a), two counts of felony murder in violation of General Statutes § 53a-54c and capital felony in violation of General Statutes § 53a-54b (7). On appeal, the defendant claims that the trial court improperly (1) denied his *Batson*[2] objections to several of the state's peremptory challenges during jury selection, and (2) admitted as evidence certain DNA test results and expert testimony linking him to physical evidence recovered from the scene of the crime. The defendant argues that these asserted errors entitle him to a new trial. We disagree and accordingly affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Sometime in the late evening of December 1, 2003, the defendant visited the home of the victims, Donna Sosa and Mary Tomasi, located on Albert Street in Hamden. The defendant was personally familiar with the victims, as his grandmother, with whom he occasionally shared a residence, lived on Green Hill Road, which abutted the victims' property. Intent on acquiring money to support his crack cocaine addiction, the defendant gained access to the victims' home and shortly thereafter attacked Sosa in the kitchen, stabbing her repeatedly in the face, neck and right shoulder. The defendant then proceeded upstairs armed with a ten pound dumbbell retrieved from the living room floor, where he found Tomasi sleeping in her bedroom. After striking Tomasi in the face with the dumbbell, fracturing her skull, the defendant searched through her purse, stealing cash and several blank checks, which he later forged in an attempt to acquire additional funds. Sosa and Tomasi died from these attacks.

---

[2] See *Batson* v. *Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

The defendant subsequently was arrested and charged with two counts of murder in violation of § 53a-54a (a), two counts of felony murder (burglary) in violation of § 53a-54c and one count of capital felony in violation of § 53a-54b (7). A jury trial followed and the defendant was convicted on all counts. At sentencing, the court merged the conviction of the murder and felony murder charges with the capital felony conviction, imposing a term of life imprisonment without the possibility of release. This appeal followed. Additional facts will be set forth as necessary.

## I

### *BATSON* CLAIM

The defendant first claims that the court improperly denied his *Batson* objections regarding the state's use of peremptory challenges to excuse three potential jurors.[3] We disagree.

In reviewing the defendant's *Batson* claims, we adhere to well established legal principles. "In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)], the United States Supreme Court recognized

---

[3] Although the defendant presents numerous disparate treatment theories with respect to these challenges on appeal, the record reveals that these claims were not properly preserved at trial, as defense counsel failed to identify adequately the alleged venire-comparators during or after voir dire, and, despite the defendant's argument to the contrary, we will not consider these theories in the first instance on the basis of review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See *State* v. *Hodge*, 248 Conn. 207, 227, 726 A.2d 531 (noting that, irrespective of *Golding*, when "the defendant [fails] to raise a disparate treatment claim with respect to [specific] venirepersons, the record is inadequate for appellate review of his claim with respect to those venirepersons"), cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). Moreover, contrary to the defendant's assertion during oral argument before this court, the record does not contain jury questionnaire forms indicative of the racial makeup of any of the venirepersons. Finally, it is noteworthy that a total of four *Batson* challenges were raised by defense counsel during voir dire, while the defendant, on appeal, has limited his argument to just three of those four challenges.

that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the [e]qual [p]rotection [c]lause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors

. . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." (Internal quotation marks omitted.) *State* v. *Monroe*, 98 Conn. App. 588, 590–92, 910 A.2d 229 (2006), cert. denied, 281 Conn. 909, 916 A.2d 53 (2007). With that standard in mind, we consider the defendant's *Batson* claims in turn.

A

Venireperson C. S.

C. S.[4] testified during voir dire that she resided in Meriden with her family and three year old daughter. She further testified that she attended Central Connecticut State University part-time during the evening and was working toward completing her undergraduate degree. As an administrative assistant for a state vendor, C. S. stated that her employment consisted mainly of taking "a lot of phone calls" and performing other secretarial services. At the conclusion of her examination, the state exercised a peremptory challenge to excuse her, and the defendant raised a *Batson* challenge. When asked to provide a race neutral explanation for removing C. S. from the panel, the prosecutor stated that, in his opinion, C. S. lacked the life experiences necessary to serve as an effective juror in the defendant's trial. The defendant countered that, as compared with other members of the petit jury already accepted, C. S. "seemed more mature" and implied that the state's motivation behind its challenge was racially discriminatory. Importantly, however, the defendant at no time conclusively identified C. S.'s race or ethnicity. In fact, nowhere in the record is C. S.'s racial makeup definitively established.[5]

[4] We use the initials of each venireperson in order to protect that venireperson's legitimate privacy interests. See *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004).

[5] Although the court itself made a cursory statement several weeks after C. S. initially testified, regarding a "young Hispanic girl," whom the defendant would argue was C. S., the record is inadequate to accept this presumption. Also, the fact that the defendant's motion for a new trial identifies C. S. as a "[H]ispanic female" is of no consequence because it represents argument, not evidence.

We cannot say, in light of C. S.'s entire voir dire examination, that the prosecutor's stated concern that she lacked the necessary "life experiences" to be an effective juror in the defendant's trial was mere pretext. See *State* v. *McDougal*, 241 Conn. 502, 520, 699 A.2d 872 (1997) (concluding state's use of peremptory challenges against "young persons" did not violate defendant's due process rights under *Batson* and Connecticut constitution). This is especially true given the inadequacies of the record as to C. S.'s racial identity. In the absence of a sufficient record, this court will not presume that C. S. was or was not a member of a particular minority group. See *State* v. *Lane*, 101 Conn. App. 540, 548–49, 922 A.2d 1107 ("we cannot review any *Batson* claim . . . that the defendant may have . . . regarding the state's use of its peremptory challenge against [a particular venireperson] because of a lack of a sufficient record"), cert. denied, 283 Conn. 910, 928 A.2d 538 (2007); *State* v. *Young*, 76 Conn. App. 392, 398, 819 A.2d 884 ("the appellant bears the burden of providing an appellate court with an adequate record for review" [internal quotation marks omitted]), cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003).

Nor do we agree with the defendant's argument that the United States Supreme Court's decisions in *Snyder* v. *Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008), and *Miller-El* v. *Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005), allow this court to consider unpreserved disparate treatment analyses for the first time on appeal, even if we assume that C. S. is a member of a minority group. As the defendant conceded during oral argument, in both *Snyder* and *Miller-El*, the record sufficiently identified the racial makeup of the challenged jurors such that a disparate treatment analysis properly could take place on appeal. See *Snyder* v. *Louisiana*, supra, 477–78; *Miller-El* v. *Dretke*, supra, 235–36. That is not the case here, and

we decline to engage in a disparate treatment analysis that is unsupported by the record. See, e.g., *State* v. *Hodge*, 248 Conn. 207, 227, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

## B

### Venireperson D. V.

D. V., a twenty-one year old African-American male from New Haven, testified that he lived with his parents and two month old son while working for Burger King. At the conclusion of D. V.'s examination, the state exercised a peremptory challenge, and the defendant requested a race neutral explanation. The state responded that it was concerned with D. V.'s "limited educational background [and] limited life experiences . . . ." Additionally, the state indicated that it was concerned with D. V.'s familiarity with the Brookside apartment complex, as the state intended to elicit testimony during trial that the defendant had frequented the Brookside apartments to purchase drugs. In contrast, the defendant argued that considerations as to D. V.'s age were inappropriate in assessing the neutrality of the state's justification for excusal and explained that, as to D. V.'s familiarity with Brookside, another juror, T. F., with comparable familiarity with the Brookside apartments, already had been accepted as a juror by the state. Also, defense counsel commented that it was "somewhat curious" that the state excused D. V. but accepted a Caucasian juror, M. S., who was twenty-six years old, a graduate of Southern Connecticut State University, and worked as an assistant manager for a package store.

Although the defendant asserts on appeal that D. V.'s personal experience with the Brookside apartments was comparable to that of T. F., he failed to raise this specific argument during voir dire and, thus, the record

is insufficient to permit our review.[6] See *State* v. *Hodge,* supra, 248 Conn. 227.

As to M. S., we agree with the state that the record supports the court's determination that the reasons offered for excluding D. V., when compared with M. S., were not pretextual. "[T]he failure to strike a white juror who shares *some* traits with a struck black juror does not itself automatically prove the existence of discrimination." (Emphasis in original; internal quotation marks omitted.) Id., 237. For example, in *Hodge,* our Supreme Court concluded that the state's acceptance of a white juror with limited formal education, when compared to the exclusion of an African-American juror, also with limited formal education, did not support a *Batson* violation. Id., 234–38. Because the state had independent grounds on which to base its acceptance of the white juror, our Supreme Court found that the shared characteristics between the two venirepersons were inconclusive as to racial animus in the state's challenge. Id., 237–38.

Here, although D. V. and M. S. may have been of similar ages, the record reveals that they also differed in important respects such that the state legitimately may have been more concerned with accepting D. V. than M. S. as a juror. Specifically, M. S. had graduated from Southern Connecticut State University with a bachelor's degree in history, while D. V. possessed a high school education and some college level courses; M. S. worked in a managerial position for a package store, while D. V. worked as a cashier for Burger King; M. S. lived in his own residence, while D. V. lived in his parents' home; and D. V. had familiarity with the Brookside apartments, whereas there is no showing of

---

[6] The defendant did not specifically identify T. F. as the comparator to D. V. for purposes of familiarity with the Brookside apartments at the time of the *Batson* challenge, nor did he identify the racial makeup of T. F., which is unconfirmed by our review of the record.

such familiarity on the part of M. S. Notwithstanding the fact that M. S. and D. V. may have shared some identifiable characteristics, we conclude that the state had sufficient reasons to select M. S. while excusing D. V. Because the defendant failed adequately to "demonstrate that the [state's] articulated reasons [were] insufficient or pretextual"; (internal quotation marks omitted) *State* v. *Monroe*, 98 Conn. App. 591; the court's rejection of the defendant's *Batson* challenge with respect to D. V. was not clearly erroneous. See id., 592.

## C

### Venireperson B. C.

B. C. testified that she resided in New Haven, and, prior to becoming disabled, had worked as a cashier at various establishments. She also testified that she previously had been convicted of possession of crack cocaine with intent to sell, for which she received inpatient rehabilitative treatment. With regard to her criminal conviction, B. C. further stated that she had been represented by the New Haven public defender's office. At the conclusion of her examination, the state initially challenged B. C. for cause, given her previous relationship with the public defender's office. The court denied this challenge and, thereafter, the state exercised a peremptory challenge, at which point the defendant requested a race neutral explanation. Given the issues likely to arise in the defendant's trial, the state expressed concern with B. C.'s "intimate familiarity with crack cocaine," as well as her representation by the New Haven public defender's office. In response, the defendant argued that "a white male . . . who used cocaine for two years" previously had been accepted by the state[7] and that B. C.'s previous relationship with

---

[7] Again, the defendant did not identify this "white male" at the time of the *Batson* challenge to B. C., and even if we were to accept the defendant's argument that another juror, F. D., was the "white male" being referred to, the record is silent as to the definitive racial makeup of F. D., aside from colloquial remarks between the parties and the court during various stages

the public defender's office was a "nonissue." The court disagreed with the defendant, finding "ample reason to excuse" B. C.

Importantly, as the prosecutor noted during his examination of B. C., the issue of crack cocaine was "likely to come up" during trial, and the fact that B. C. had been convicted of possession of crack cocaine with intent to sell differentiated her from other venirepersons, including those who admitted previous drug use. "We decline to ascribe a racial animus to the state's excusal of a venireperson with an arrest record simply because that venireperson [is] black. We agree with courts in other jurisdictions that this concern constitutes a neutral ground for the state's exercise of a peremptory challenge to excuse a black venireperson." *State* v. *Smith*, 222 Conn. 1, 14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992).

We also note that at the time the *Batson* challenge was raised as to B. C., eight jurors had been selected, two of whom were black. "As we previously have noted, the trial court, in assessing the validity of the state's proffered reasons, is entitled to take into account the extent to which the state has accepted minority venirepersons. . . . The waiving of a challenge when minority venirepersons were available for challenge, though it provides no insulation from judicial scrutiny, is a factor that can lend some support to a finding of race neutral challenges." (Citation omitted; internal quotation marks omitted.) *State* v. *Hodge*, supra, 248 Conn. 260.

---

of the voir dire process. Moreover, even accepting the defendant's argument that F. D. was the Caucasian comparator for purposes of this appeal, the record reveals substantial differences between F. D. and B. C., thereby justifying the state's peremptory challenge, including the fact that B. C., unlike F. D., had been convicted of possession of crack cocaine with intent to sell.

As with D. V., the defendant failed to demonstrate adequately to the court that the state's proffered reasons for excusing B. C. were pretextual. Accordingly, we conclude that the court's denial of the defendant's *Batson* challenge as to D. V. was not clearly erroneous.

## II

### ADMISSIBILITY OF THE STATE'S DNA EVIDENCE

The defendant next claims that the court improperly denied his motion in limine to preclude expert scientific testimony and DNA test results linking him to physical evidence found at the crime scene. Again, we disagree with the defendant.

The following additional facts and procedural history are relevant to the resolution of the defendant's second claim on appeal. Prior to trial, the defendant filed a motion in limine seeking to preclude, inter alia, expert scientific testimony and DNA test results regarding the presence of his DNA on the dumbbell and purse found next to Tomasi's lifeless body. Specifically, the defendant argued that the proffered scientific evidence was inadmissible under *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), because the DNA testing procedure utilized to find that he "[could not] be eliminated" as a contributor to the "mixed" DNA samples tested was invalid and irrelevant, or, alternatively, more prejudicial than probative.

The court thereafter held an extensive *Porter* hearing, in which it heard expert testimony from both the state and the defense as to the precise methodology employed by the state's forensic science laboratory to test the DNA samples recovered, a methodology known as the "combined probability of inclusion" (CPI method). Although the defendant acknowledged the general validity and acceptance of the CPI method, he

disagreed with its application to his case, given the limited nature of the DNA samples available, as further supported by a claimed dispute to this effect within the "forensic DNA community." After finding the parties' experts credible, the court denied the defendant's motion in limine, and, subsequently, the state's expert, Michael T. Bourke, a geneticist, was permitted to testify as to the scientific evidence at trial.

Before addressing the merits of the defendant's argument, we begin with the applicable legal principles and standard of review governing our analysis. In *State* v. *Porter*, supra, 241 Conn. 57, our Supreme Court adopted the test for determining the admissibility of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). In so doing, our Supreme Court noted two threshold requirements to the admissibility of scientific evidence. First, "that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Porter*, supra, 64. Second, the scientific evidence "must 'fit' the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." Id., 65.

However, "even if a scientific theory or technique satisfie[s] both of the previous criteria and thus would be [initially] admissible under [*Porter*], it can still be

excluded . . . if its probative value is substantially out-weighed by the danger of unfair prejudice . . . ." (Citation omitted; internal quotation marks omitted.) Id. Nonetheless, "questions about the methodological validity of proffered scientific testimony will generally go to the *weight* of such evidence, not to its admissibility." (Emphasis in original.) Id., 88. Similarly, "[o]nce the validity of a scientific principle has been satisfactorily established, any remaining questions regarding the manner in which that technique was *applied* in a particular case is generally an issue of fact that goes to weight, and not admissibility." (Emphasis in original.) Id., 88 n.31.

Finally, it is well established that "[t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . [Accordingly] [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [C]onsistent [therewith] . . . a trial court's ruling on a *Porter* issue is subject to an abuse of discretion standard on appeal"; (citations omitted; internal quotation marks omitted) *State* v. *Kirsch*, 263 Conn. 390, 399, 820 A.2d 236 (2003); as is the court's determination that the probative value of evidence is or is not substantially outweighed by undue prejudice. See *State* v. *Raynor*, 84 Conn. App. 749, 761, 854 A.2d 1133, cert. denied, 271 Conn. 935, 861 A.2d 511 (2004).

In the present case, the crux of the defendant's argument is that the court wrongly concluded under *Porter* that use of the CPI method of reporting the result had gained general acceptance among laboratory practitioners in situations involving low quantity, mixed DNA samples. Indeed, much of the defendant's argument in this regard is devoted to explaining the complex scientific shortcomings associated with use of the CPI method in such situations, as emphasized by conflicting

rhetoric and debate within the "forensic DNA community." As the defendant argues, the existence of this "significant [dispute]" deprives the CPI method of "scientific acceptance and reliability" under *Porter* in this case, which is compounded by the intrinsic difficulties of explaining the inadequacies to the jury.

Contrary to the defendant's arguments, the record is devoid of any evidence demonstrating that the court definitively identified the "relevant scientific community" as the laboratory practitioners who actually used the CPI method. Rather, the court properly evaluated, over the course of five days, the expert testimony from five witnesses regarding the strengths and weaknesses of the CPI method in cases similar to that of the defendant. Each of these witnesses had significant training and experience not just within the laboratory setting but also as geneticists and forensic scientists.[8] At the conclusion of the *Porter* hearing, the court determined that "the [CPI methodology was] generally accepted as of the present time in the relevant scientific community based upon [all of] the evidence" presented—namely, the testimony of the experts. Although the court did not expressly articulate what scientific community was being identified, the defendant has not demonstrated that the court's application of the *Porter* analysis was faulty, especially given the backgrounds of the experts and the nature of their testimony.

Moreover, the court's evaluation of the validity of the scientific evidence was not limited to the specific CPI testing in this case, but also necessarily included considerations of the general benefits and limitations of the

[8] The state called Carll Ladd, Frederick Bieber and Michael T. Bourke during the *Porter* hearing, each of whom had extensive training and educational backgrounds in population genetics, though only Bourke actually testified at trial. The defense called Keith Inman, who had extensive training in various aspects of criminal forensics, and Kenneth Kidd, a population geneticist.

procedure when low quantity, mixed DNA samples are involved. Under *Porter*, once the "trial court determines that a scientific methodology has gained general acceptance, then the *Daubert* inquiry will generally end and the conclusions derived from that methodology will generally be admissible." *State* v. *Porter*, supra, 241 Conn. 85. Similarly, *Daubert* teaches that "trial judges are not required to make a determination of the ultimate scientific validity of any scientific propositions. Instead, they need only make a much more limited inquiry: whether sufficient indicia of legitimacy exist to support the conclusion that evidence derived from the [scientific] principle may be profitably considered by a fact finder at trial." Id., 91. Thus, "[a] judge frequently should find an expert's methodology helpful [and thus admissible] even when the judge thinks that the expert's technique has flaws" in a particular case. (Internal quotation marks omitted.) Id., 89. This is because "the focus of a validity assessment must be solely on principles and methodology, not on the conclusions that they generate." (Internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 877, 776 A.2d 1091 (2001).

Accordingly, we cannot say that the court had "[in]sufficient indicia of legitimacy" on which to conclude that the CPI test as applied to the defendant's case lacked the requisite validity under the first prong of *Porter. State* v. *Porter*, supra, 241 Conn. 91. Additionally, the court properly could have determined that the jury would appropriately consider the benefits and weaknesses of the CPI method, as such an understanding does not necessarily depend on a scientific appreciation of the evidence but only on a comprehension of its limits when low quantity, mixed DNA samples are tested. See id., 89 ("[in admitting scientific evidence, the court] will often . . . believe that hearing the expert's testimony and assessing its flaws was an important part of

assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence" [internal quotation marks omitted]). The inconclusive characteristics of the CPI method's results were the proper subject for cross-examination, and were not to be considered in isolation but in conjunction with the various other forms of scientific evidence presented by the state at trial. See *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, supra, 509 U.S. 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

We conclude that the court did not abuse its discretion in admitting the state's scientific evidence under *Porter*. The court therefore properly denied the defendant's motion in limine.

The judgment is affirmed.

In this opinion the other judges concurred.