STATE OF CONNECTICUT *v.* SOMEN SHIPMAN
(AC 34672)

Gruendel, Sheldon and Borden, Js.

---

Argued January 8—officially released April 23, 2013

*Damon A. R. Kirschbaum,* assigned counsel, for the appellant (defendant).

*Nancy L. Walker,* special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga,* state's attorney, and *C. Robert Satti, Jr.,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Somen Shipman, appeals from the judgment of conviction, rendered after a jury trial, of two counts of murder in violation of General Statutes § 53a-54a (a), one count of capital felony in violation of General Statutes § 53a-54b (8), and one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a. The defendant claims that (1) our Supreme Court improperly granted the state's motion to reconsider its order to rectify the trial court record to reflect the races of the jury venirepersons and (2) the trial court improperly permitted the state to exercise a peremptory challenge to excuse a black venireperson from sitting as an alternate juror. We decline to review the merits of the defendant's first claim and affirm the judgment of the trial court.

The following facts, as reasonably could have been found by the jury, are relevant to the resolution of the defendant's claims. In October, 1996, Torrance McClain, Norman Gaines and the defendant were entrenched in Bridgeport's drug trade. Sometime in mid-October, Ronald Marcellus, another drug dealer and an associate of McClain, Gaines and the defendant, engaged with Gary Louis-Jeune in an angry verbal exchange over their respective drug dealing enterprises. Following this exchange, Marcellus requested that the defendant "take

care of [the situation]" for him because Louis-Jeune was attempting to "move in on the block." The defendant and Gaines,[1] on the evening of October 29, 1996, thereafter shot Louis-Jeune and his girlfriend, Marsha Larose, multiple times, killing both of them.

In December, 1996, McClain was arrested and pleaded guilty to drug charges. Before he was sentenced pursuant to his guilty plea, McClain provided the Bridgeport police with a written statement indicating that Gaines and the defendant were responsible for the shooting of Louis-Jeune and Larose. The defendant subsequently was arrested and charged with one count of capital felony, two counts of murder and one count of conspiracy to commit murder. After a trial, the jury returned a verdict of guilty on all charges, and the court, on April 28, 2000, rendered judgment in accordance with the verdict. Merging the two counts of murder with the capital felony charge, the court sentenced the defendant to life imprisonment without the possibility of release, to run concurrently with twenty years imprisonment on the charge of conspiracy to commit murder, for a total effective sentence of life imprisonment without the possibility of release.

In June, 2000, the defendant appealed his conviction directly to the Supreme Court, following which he moved for rectification of the trial court record to establish the races of the jury venirepersons. The trial court denied his motion and, thereafter, the defendant moved for review by the Supreme Court. On March 16, 2004, the Supreme Court granted the motion and the relief requested therein. On November 17, 2011, the state moved for reconsideration of the Supreme Court's granting of the defendant's motion for rectification of

---

[1] Gaines was tried and convicted of the murders of Louis-Jeune and Marsha Larose. His conviction was affirmed by the Supreme Court. *State* v. *Gaines*, 257 Conn. 695, 778 A.2d 919 (2001).

the record. The Supreme Court granted both the state's motion and the relief requested therein, stating: "Upon careful review of the record, it is apparent that the defendant failed to raise a disparate treatment claim in the trial court and, therefore, is not entitled to rectification of the record to augment [it] with evidence to support such a claim. See, e.g., *State* v. *Hodge*, 248 Conn. 207, 227 [726 A.2d 531] (when 'the defendant [fails] to raise a disparate treatment claim with respect to [specific] venirepersons, the record is inadequate for appellate review of his claims with respect to those venirepersons'), cert. denied, 528 U.S. 969 [120 S. Ct. 409, 145 L. Ed. 2d 319] (1999); *State* v. *Haughey*, 124 Conn. App. 58, 61 n.3 [3 A.3d 980] (same) [cert. denied, 299 Conn. 912, 10 A.3d 529 (2010)]." Thereafter, pursuant to Practice Book § 65-1, the Supreme Court transferred the defendant's appeal to this court.

I

The defendant first claims that our Supreme Court improperly granted the state's motion to reconsider its granting of the defendant's motion for rectification of the record and its granting of the relief requested therein. In raising this claim, the defendant invites this court to substitute our judgment for that of our Supreme Court. We reject his invitation.

"As an intermediate appellate body, it is axiomatic that the Appellate Court is . . . not at liberty to overrule or discard the decisions of our Supreme Court but [is] bound by them. . . . [I]t is not within our province to reevaluate or replace those decisions. . . . Our Supreme Court is the ultimate arbiter of the law in this state [and] [w]e, as an intermediate appellate court, cannot reconsider the decisions of our highest court." (Citations omitted; internal quotation marks omitted.) *Hartford Steam Boiler Inspection & Ins. Co.* v. *Underwriters at Lloyd's & Cos. Collective*, 121 Conn. App.

31, 48–49, 994 A.2d 262, cert. denied, 297 Conn. 918, 996 A.2d 277 (2010); see also *Stuart* v. *Stuart*, 297 Conn. 26, 45–46, 996 A.2d 259 (2010) ("it is manifest to our hierarchical judicial system that [the Supreme Court] has the final say on matters of Connecticut law and that the Appellate Court and Superior Court are bound by [its] precedent").

Our Supreme Court has determined, finally, that under Connecticut law, the defendant is not entitled to a rectification of the trial court record. To engage in a reanalysis of the defendant's claim and a review of our highest court's decision on the matter would be both improper and fruitless. We, therefore, decline to afford it review.

## II

The defendant next claims that the trial court improperly permitted the state to exercise a peremptory challenge of a black venireperson, T.G.,[2] in violation of the defendant's and the excluded juror's rights under the equal protection clause of the fourteenth amendment to the United States constitution. Specifically, the defendant argues that the court (1) incorrectly found that the state's proffered reasons for excluding T.G. were not pretext for racial discrimination, and (2) improperly offered and relied on its own race neutral reason for excusing T.G. We are not persuaded by either of these arguments.

After the petit jury had been selected for the defendant's trial, voir dire of prospective alternate jurors began. During voir dire of T.G., among other topics, the prosecutor, C. Robert Satti, Jr., questioned him regarding his knowledge of the neighborhood in which the murders occurred and whether he had family or friends

[2] To protect the legitimate privacy interests of the venirepersons involved in this case, we refer to them only by their initials. See, e.g., *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004).

who were police officers. T.G. revealed that he was familiar with and frequented the area where the murders were committed "[a]t least two times a week." T.G. also testified that his father was a police officer in Florida involved in drug task force work while T.G. was living with him. The defendant's counsel, Lawrence Hopkins, did not pose any questions to T.G.

Following voir dire of T.G., Satti attempted to exercise one of the state's peremptory challenges to excuse him. Hopkins then requested, pursuant to *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), that Satti articulate for the record his reasons for excluding T.G. The court granted Hopkins' request and then engaged in the following colloquy:

"Mr. Satti: . . . The two reasons that I would put on the record are the knowledge of the area, more specifically, the knowledge of the area of the homicide where he indicated he would go through at least two or three times; I thought it was a minimum [of] a month or a week, I'm not sure exactly. And then Laurel Court, he indicated, though, back in [1996] he wasn't through there, he did know the area. And, I have a concern that although people may not know names, they would see faces. These are known drug areas. It is expected additionally that we will have evidence about drug dealing in this.

"And, one of the—I believe, it would be, in my view, a minor concern, but I think it's part of the total package, is the father working as a police officer, does not normally excuse somebody, but working a drug task force, and we expect there will be drug dealing and the like. . . . But, I think that knowing the area sufficiently is a concern for me as to what might he bring by way of knowledge of people and the like.

"Mr. Hopkins: . . . I don't think he—his responses to any one—any question that was posed to him would

indicate that it would be a problem with any of the things that Mr. Satti suggested there even might. And, consequently, I think the juror ought to be seated.

"I'm concerned. We've had precious few minorities, particularly blacks in this case, on the voir dire panel who were able to serve or not prohibited from serving, I should say, for some valid reason, whether, for example, the black woman this morning who was ill, people had problems with jobs, et cetera. And, I understand that that's a fact of life and I accept that. But, I think in this case, of this twenty-four year old black man, [T.G.], he didn't give any response that would indicate any cause for concern, bias, prejudice, or any problem that I can see, and I think, consequently, he ought to be seated. Particularly in light of the fact that we have so few blacks on the panel at this juncture.

"The Court: Anything else, Mr. Satti?

"Mr. Satti: I was just—he's raised an additional ground on the issue of who was seated on the panel, which goes a little beyond what this particular individual, my reasons for the particular individual. . . .

"The Court: But, it certainly can be raised within the context of *Batson* in general.

"Mr. Satti: No, I'm suggesting the additional argument is, what has the state done in the past—

"The Court: Yes. Exactly.

"Mr. Satti:—as far as the seating of jurors.

"The Court: Okay.

"Mr. Satti: And, my recollection is that we have accepted previously at least one clear member of a minority, who, unfortunately, that was [T.E.], for [a] different reason unrelated to the state's—

"The Court: Who I ultimately excused because of employment problems, which she was kind enough to come in and stated for the record her reasons for not being able to be with us. That's correct. Go ahead.

"Mr. Satti: I'm quickly going through and I believe there's at least, who could be classified, as I see it through my notes, three or four minorities alone. Whether they're African-American or black. . . . [M]y point is that we have not been routinely excluding black individuals. We have been accepting them, and for different reasons, they have not been before the panel. So, I would suggest to the court that this is not an issue of a pattern. . . .

"Mr. Hopkins: I did not mean to suggest that, by the way.

"Mr. Satti: Oh, I'm sorry.

"The Court: No, no. There doesn't necessarily have to be a pattern. The court has to take into consideration the—either the questioning of the proposed venireman or the lack thereof. I will admit that the state's attorney has been consistent in terms of his shown concern with—for anybody who has a working knowledge of the area in question. It seems to me that there was a certain reticence on the part of the venireperson in terms of the state's attorney exploring his knowledge of the area in question. I think that that is, in and of itself, a sufficient race neutral reason in terms of the exercise here.

"And, I think, given the totality of the circumstances and based upon the history of the questioning of the venire people, venirepersons, here, I think that the state's attorney has given sufficient reason, given sufficient race neutral reason for excuse, and therefore, I'm going to allow him to exercise a peremptory."

After excusing T.G., the court made the following comment: "The record should reflect, by the way, that the court likewise was somewhat concerned with the fact that his father had experience here as a narcotics enforcement, which seemed to me to be a concern that, in general, one would have in terms of his basic fairness on behalf of this defendant, given the fact that there would be certain evidence adduced as to possible drug transactions being involved in this case . . . . And, therefore, the record should reflect that that might be a concern that the court in and of itself might have with regard to this venireperson."

Following T.G.'s excusal, the defendant made no requests to add information regarding the races of either selected or excused jurors, and, accordingly, the record does not indicate the races of any of the jurors except for T.E., who was excused by the court after presenting a hardship excuse, and T.G. The defendant made no such request until after the jury had returned its guilty verdict and he initiated his direct appeal to the Supreme Court. As our Supreme Court has made the ultimate decision that the record ought not be rectified, we base our review on the record as it now stands. See part I of this opinion.

We begin by setting forth the well established principles of law that govern *Batson* claims. "Peremptory challenges are deeply rooted in our nation's jurisprudence and serve as one state-created means to the constitutional end of an impartial jury and a fair trial. . . . Although such challenges generally may be based on subjective as well as objective criteria . . . they may not be used to exclude a prospective juror because of his or her race or gender. . . .

"In *Batson* . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury

raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established [the existence of] purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race . . . as the challenged juror

were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race . . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubts raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 343–

46, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

The defendant contends that the court improperly found that the state's articulated reasons for exercising its peremptory challenge to excuse T.G. were not pretexts for racial discrimination. He asserts that the court's finding was clearly erroneous because the state questioned other nonminority jurors differently than it questioned T.G. and accepted or did not exercise peremptory challenges to excuse other nonminority jurors with responses similar to those offered by T.G. on voir dire. We cannot, however, review the merits of this claim because the record does not include the races of the relevant venirepersons.[3]

The races of the relevant venirepersons are requisite facts without which we are unable to conduct a comparison of the state's treatment of T.G., a black venireperson, against its treatment of nonminority venirepersons. See *State* v. *Hodge*, supra, 248 Conn. 228 ("[b]ecause a disparate treatment claim raises factual questions that must be decided by the trial court, the defendant's failure to raise the claim in the trial court is fatal to his claim on appeal");[4] see also *United States* v. *Houston*, 456 F.3d 1328, 1338 (11th Cir. 2006) (without adequate record, court lacks "benefit of the prosecutor's explanation for why he struck the black venire

[3] We note that, in his brief to this court, the defendant himself concedes that "[t]his [c]ourt cannot provide meaningful and effective review of [his] *Batson* claim without having the record rectified to show the races of the relevant venirepersons."

[4] The defendant argues that *Hodge*, insofar as it precludes review of disparate treatment claims raised for the first time on appeal, has been overruled by the United States Supreme Court cases *Miller-El* v. *Dretke*, 545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005), and *Snyder* v. *Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008). We need not decide that issue, however, because neither *Miller-El* nor *Snyder* addressed the case, as is present here, where the record does not contain the requisite facts to review a disparate treatment claim not raised in the trial court.

members rather than the white venire members now alleged to be similarly situated" and the "benefit of a finding by the trial judge as to the credibility of such explanations"), cert. denied, 550 U.S. 926, 127 S. Ct. 2148, 167 L. Ed. 2d 877 (2007). In order to conduct such a comparison, the defendant urges this court to assume, based upon comments made on the record that there were very few minority venirepersons, that the comparative venirepersons are nonminorities.[5] This proposition, however, overlooks the bedrock principle that "[w]e afford review only to claims based on the complete factual record developed by the trial court. We do not guess or speculate as to the existence of a factual predicate." *Holmes* v. *Holmes*, 32 Conn. App. 317, 319, 629 A.2d 1137, cert. denied, 228 Conn. 902, 634 A.2d 295 (1993). We, therefore, cannot review the defendant's disparate treatment claim.

Next, the defendant argues that the court improperly found that the state's proffered reason for excluding T.G. was not pretextual because the reason offered was "implausible and fantastic." In particular, the defendant contends that the court erroneously found that one of Satti's reasons for excusing T.G., the reason that was based on his father's experience as a police officer involved with narcotics work, was not pretext for purposeful discrimination because Satti, as a prosecutor, would not exclude a venireperson for being biased in favor of the police. We disagree with the defendant's characterization of the record and, accordingly, his argument.

"In *Purkett* v. *Elem*, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995), the [United States Supreme Court] explained the manner in which the second procedural step required under *Batson* should be applied: Under

---

[5] Inexplicably, the defendant suggests that we assume, in the alternative, that all of the relevant venirepersons were black.

our *Batson* jurisprudence . . . [t]he second step of this process does not demand an explanation that is persuasive, or even plausible. At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. . . . It is not until the *third* step that the persuasiveness of the justification becomes relevant. . . . At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." (Emphasis in original; internal quotation marks omitted.) *State* v. *Hodge*, supra, 248 Conn. 219 n.18.

At the outset, we note that we need not reach the question of whether a prosecutor offering a venireperson's bias toward the police as a reason for exercising a peremptory challenge would tend to indicate that there existed pretext for purposeful discrimination because the record does not reveal that Satti exercised his peremptory challenge for this reason. Rather, Satti mentioned during argument on the defendant's *Batson* challenge that he had "a minor concern" about T.G.'s father "working a drug task force" when Satti "expect[ed] there [would] be [evidence in this case of] drug dealing and the like." Satti's explanation indicates that his principal reason for excluding T.G. was not his possible bias in favor of the police, but his potential knowledge of or familiarity with the general subject of drug dealing. On this record, we cannot conclude that Satti's proffered reason was "implausible and fantastic" or that the court's determination that this reason was not pretext had no evidence to support it. The court's finding, therefore, was not clearly erroneous.

The defendant also claims that the court's finding that there was no pretext with respect to the state's proffered reason was clearly erroneous because, in making its determination, it relied on a race neutral reason for excusing T.G. that was provided by the court rather than the state. We do not agree.

"A *Batson* challenge does not call for a mere exercise in thinking up any rational basis [for exercising a peremptory challenge]. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false. The [court's] . . . substitution of a reason for eliminating [a venireperson] does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions." *Miller-El* v. *Dretke*, 545 U.S. 231, 252, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005).

After engaging in its *Batson* analysis and finding that the state had not engaged in purposeful discrimination, the court excused T.G. Only after excusing T.G. did the court note for the record that it had its own concerns about T.G.'s fitness to serve as a juror. The court's concerns surrounded T.G.'s exposure to his father's experience on a drug task force and indicated that the court believed that T.G. may not have been able to render a fair and impartial decision in the defendant's case, which would likely relate to the drug trade. The defendant has pointed to no evidence that this consideration substituted for the state's proffered reason for excluding T.G., or that it entered into the court's evaluation of the defendant's *Batson* challenge whatsoever. Rather, from the record, it appears that the court merely was articulating that it had observed grounds that could have been the basis for excusing T.G. for cause. As the court is well within its province to excuse a venireperson "if the judge . . . is of the opinion from the [voir dire] examination that [the] [venireperson] would be unable to render a fair and impartial verdict"; (internal quotation marks omitted) *State* v. *Griffin*, 251 Conn. 671, 699, 741 A.2d 913 (1999); explaining its apprehension about T.G.'s ability to be fair to the defendant does not, alone, undercut the court's finding, based on the evidence before it, that the state had not engaged in

purposeful discrimination.[6] We, therefore, conclude that the defendant has not demonstrated that the court's finding was clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[6] The defendant claims also that the court, in stating that T.G.'s reticence to discuss his knowledge of the area where the homicides occurred would be "in and of itself" a "sufficient race neutral reason" to exercise a peremptory challenge, improperly substituted its own reason for that of Satti. The record, however, belies this claim, as the court went on to state that "given the totality of the circumstances and based upon the history of the questioning . . . *the state's attorney* has given sufficient . . . race neutral reason" for exercising his peremptory to excuse T.G. "and, therefore, [the court was] going to allow [the state] to exercise a peremptory." (Emphasis added.) While the court noted its own observations of T.G.'s demeanor and hypothesized about it being a permissible reason for exercising a peremptory challenge, the court plainly indicated that the state provided a credible race neutral reason and that this was the basis for allowing the state's exclusion of T.G.